**Arlington**

AMERICAN SAFETY RAZOR COMPANY, et al.

v.

EMMETT P. HUNTER

No. 0842-85

Decided May 6, 1986

COUNSEL

Douglas L. Guynn (M. Bruce Wallinger; Wharton, Aldhizer & Weaver, on brief), for appellants.

Charles N. Bishop, Jr., for appellee.

OPINION

**BENTON, J.**—This appeal presents several issues with respect to intoxication of a claimant as a defense to a workers' compensation claim. We agree with the Industrial Commission that the employer, American Safety Razor Company, did not meet its burden of proving injury due to intoxication as provided by Code § 65.1-38, and for this reason, we affirm.

On the night before the accident the claimant, Emmett P. Hunter, was drinking whiskey until approximately 4:30 a.m. He also drank three cans of beer at some time before his shift began. Hunter admitted before the deputy commissioner that he was an alcoholic.

On the date of the accident, Hunter arrived at work approximately one-half hour before his shift began at 3:30 p.m. His supervisor, Dennis Masoncupp, saw Hunter clock in and walked down an aisle with him. Masoncupp noticed nothing unusual about Hunter's condition at the time.

Hunter, a warehouseman, then began filling out "location cards" and waited for a co-worker, Tommy Curry, to arrive. When Curry arrived, Hunter gave him a location card and climbed onto a pallet on a forklift driven by Curry. Hunter testified that he was holding onto the "rail." Curry drove the forklift to the first location and elevated the pallet, upon which Hunter stood, to approximately eight feet. Hunter picked up thirteen cases, loading them on the pallet from the back to the front. He

told Curry that they could proceed to the next location. Curry then "backed off and made an immediate right and then a left and went to the next location," where Hunter loaded more cases in the same manner as before, placing them on the pallet from back to front.

He then hollered to Curry, "Tommy, I've done made a mistake . . . I picked up 13 cases instead of 12." Curry uttered an expletive and quickly drove the forklift back to the first location. Hunter was standing on the elevated pallet, holding onto the "bar." Standing on the edge of the pallet, he removed the thirteenth box. As soon as he dropped the box into the storage bin, the forklift "lurched backwards." Hunter realized that he was going to fall and, aware that there was nothing he could grab, "straightened up just like you'd go off a high diving board." He landed on his feet, fracturing both heels. Curry summoned the supervisor, Masoncupp.

Masoncupp testified that Hunter seemed coherent and answered the supervisor's questions. He also noticed nothing unusual about Hunter's condition. Masoncupp said that the only training he had received as to whether someone is under the influence of alcohol was "if we smell it or if his eyes are blurred." Masoncupp was not asked whether he had observed these conditions in Hunter.

Masoncupp reported the accident to Netta Coalter, employer's plant nurse. Coalter testified that Hunter did not seem to be in a great deal of pain and that he responded "rather slowly" to her questions. Coalter also testified that she was aware of his "drinking problem."

Hunter was transported to the hospital. The hospital admission form contains the notation "alcoholic delirium tremens." At 5:15 p.m., approximately one hour and fifteen minutes after the accident, a sample of Hunter's blood was drawn. Laboratory analysis revealed a blood alcohol content of 227 milligrams per deciliter (or .227 percent). Employer introduced the deposition of Dr. Arna Morrison, a pathologist at the Rockingham Memorial Hospital, concerning the blood alcohol test.

On the basis of the reported .227 percent blood alcohol content at 5:15 p.m. and studies which indicate that the metabolism of alcohol is a straight-line function, Dr. Morrison extrapolated the

blood alcohol content of an alcoholic at 4:15 p.m. and 3:15 p.m. as .260 and .307 percent, respectively. He testified that "there may be individual variations from person to person" and that the results would be less for non-alcoholics. He also testified that all persons with .227 percent blood alcohol content would suffer significant impairment of motor function and mentation processes. A trained observer would recognize as intoxicated between 95 and 100 percent of all persons, including alcoholics, with blood alcohol content in excess of .20 percent. Given the .227 blood alcohol content at 5:15 p.m., Dr. Morrison said that in his opinion a person certainly would have been intoxicated at 4:15 p.m. and more than likely would have been intoxicated at 3:15 p.m.

The employer's first contention presents an issue apparently of first impression in the Virginia courts. Relying on Dr. Morrison's testimony and the Commission's decision in *Hopkins* v. *City of Richmond,* 58 O.I.C. 187 (1979), the employer argues that by reporting to work severely intoxicated Hunter removed himself from the scope of his employment and thus was barred from compensation even though intoxication may not have been the direct cause of his fall. *Id.* at 188.

An employee may abandon his employment by reaching an advanced state of intoxication which renders the employee incapable of engaging in his duties. 1A A. Larson, *The Law of Workmen's Compensation* § 34.21 (1985). This result is not based upon a special statutory defense of intoxication. *Id.* Rather, a severely intoxicated employee has removed himself from the scope of his employment. Any injuries thereafter suffered are not "in the course of" the employment. *See* Code § 65.1-7. The Commission in *Hopkins* described this view as "based upon sound workmen's compensation principles." *Hopkins* v. *City of Richmond,* 58 O.I.C. at 188. We agree with this statement and note that it accords with familiar principles governing industrial accidents. *See Grand Union Co.* v. *Bynum,* 226 Va. 140, 143-45, 307 S.E.2d 456, 458 (1983); *Graybeal* v. *Montgomery County,* 216 Va. 77, 78-80, 216 S.E.2d 52, 53-54 (1975).

The rule does not apply, however, where an intoxicated employee continues actively to perform his duties. 1A A. Larson, *supra,* at § 34.21. Unlike *Hopkins,* this case does not involve a claimant who "[t]hrough his own misconduct . . . rendered himself incapable of performing" his duties. 58 O.I.C. at 188. The

claimant here reported for work, began his assigned tasks, and suffered an industrial accident approximately one-half hour later. The *Hopkins* rule, therefore, has no application to the circumstances of this case, as the Commission apparently concluded.[1] We need not decide precisely at what point and under what circumstances an employee, through severe intoxication, can remove himself from the scope of his employment.

■ The employer next contends that the Commission erred in its finding that the defense of intoxication was not established:

> No compensation shall be allowed for an injury or death. . . . (3) [d]ue to intoxication . . . . The burden of proof shall be upon him who claims an exemption or forfeiture under this section.

Code § 65.1-38. To establish this affirmative defense, an employer must prove by a preponderance of the evidence that intoxication proximately caused the claimant's injuries. *See Ivey* v. *Jerry P. Puckett Construction Co.*, 230 Va. 486, 487, 338 S.E.2d 640, 640 (1986).

The deputy commissioner concluded that "it is more probable than not that Hunter was intoxicated at the time of the fall." The deputy commissioner, however, also found that:

> [t]he evidence preponderates in proving that the forklift should have been lowered before it was moved backwards and the unexpected movement of the vehicle is found to be a persuasive explanation for the fall. Mr. Hunter has established more than a plausible explanation for the occurrence of the fall aside from his intoxication and the evidence fails to persuade the Commission that the fall would not have occurred had the claimant been sober.

---

[1] Although employer raised the *Hopkins* contention before the Commission, neither the deputy commissioner nor the full Commission on review cited the case. The Commission did express "serious doubt" as to the evidence of intoxication and whether claimant would have been able to perform his duties at the time of his fall had he been so intoxicated.

The full Commission on review took the following view of the evidence of intoxication:

> If the blood alcohol analysis is correct, the claimant would have been in a state of obvious intoxication at the time he encountered his foreman upon reporting for work. There is serious doubt that he would have been able to perform the duties in which he was engaged at the time of his fall. His intoxicated condition should have been obvious to the plant nurse, who saw him immediately after the fall. The employer's evidence establishing the claimant's willful misconduct therefore fails to meet the requisite burden of proof.

In view of Hunter's unrebutted evidence as to the circumstances of the fall, the Commission held that employer had failed to carry by a preponderance of the evidence its affirmative defense of intoxication. The employer, however, contends that no credible evidence supports the Commission's finding, and as a result the question becomes a matter of law. *See Conner* v. *Bragg,* 203 Va. 204, 206-207, 123 S.E.2d 393, 395 (1962); *Uninsured Employer's Fund* v. *Keppel,* 1 Va. App. 162, 165, 335 S.E.2d 851, 852-53 (1985).

Dr. Morrison testified that an untrained observer might not be able to recognize as intoxicated a person with a blood alcohol content in excess of .20 percent. The doctor also testified, however, that most persons with a blood alcohol content in excess of .20 percent would suffer significant impairment of coordination, manifested by slurring of speech and staggered gait. Apart from the nurse's testimony that Hunter answered her questions "rather slowly," neither Masoncupp nor Coalter observed anything "unusual" in Hunter's condition before or after the fall. The Commission was entitled to weigh Dr. Morrison's testimony against that of Masoncupp and Coalter. Furthermore, a finding of fact based on conflicting evidence is binding on us. Code § 65.1-98; *see Virginia Electric & Power Co.* v. *Kremposky,* 227 Va. 265, 269, 315 S.E.2d 231, 233 (1984); *Crisp* v. *Brown's Tysons Corner Dodge, Inc.,* 1 Va. App. 503, 504, 339 S.E.2d 916, 916 (1985).

Proving intoxication, however, was but a first step in establishing the affirmative defense set out in Code § 65.1-38. The employer must also prove that this intoxication proximately caused

Hunter's injury. We agree with the Commission that the employer did not carry its burden of proof.

Hunter's testimony regarding the accident was clear and unrebutted. After becoming aware of his error, Hunter, while elevated on the pallet, was driven by Curry to the first location. As Hunter dropped the thirteenth box in a storage bin, the forklift "lurched backwards," causing him to fall. Hunter also described his co-worker Curry as "a little temperamental" and said that Curry considered him "dumb."

Finally, the employer contends that there was a "bar" or "rail," which apparently is a part of the forklift, for Hunter to grasp in the event the forklift moved suddenly. Hunter testified that he had grasped the "bar" while returning to the first location. The uncontroverted evidence is that when the forklift "lurched backwards" Hunter was unable to grasp this "bar" from his position at the front of the pallet. Hunter further testified that the pallet was not a "safety skid" with an attached bar or railing. From his position at the front of the pallet, eight feet above the ground, there was only one direction for him to go—down.

The Commission found that the sudden movement of the forklift rather than intoxication caused Hunter's injury. There is abundant credible evidence in the record to support this finding. We must, therefore, affirm the Commission's judgment. *See Ivey v. Jerry P. Puckett Construction Co.,* 230 Va. at 489, 338 S.E.2d at 641; *Uninsured Employer's Fund v. Keppel,* 1 Va. App. at 165, 335 S.E.2d at 852.

*Affirmed.*

Cole, J., and Duff, J., concurred.